AF Approval _AF_                                          Chief Approval _M/a_ _AH4_

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                          CASE NO.  8:21-cr-28-T-36JSS

KELLY WOLFE

## **PLEA AGREEMENT**

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by Maria Chapa Lopez, United States Attorney for the Middle District of Florida, and the defendant, Kelly Wolfe, and the attorney for the defendant, Ed Suarez, Esq., mutually agree as follows:

### A.    **Particularized Terms**

1.    Counts Pleading To

The defendant shall enter a plea of guilty to Count One of the Information. Count One charges the defendant with conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349. The defendant shall also enter a plea of guilty to Count Two of the Information. Count Two charges the defendant with making a false return, in violation of 26 U.S.C. § 7206(1).

Defendant's Initials ___KW___

2.    Maximum Penalties

Count One carries a maximum sentence of 10 years' imprisonment, a fine of $250,000, a term of supervised release of not more than 3 years, and a special assessment of $100. Count Two carries a maximum sentence of 3 years' imprisonment, a fine of $250,000, a term of supervised release of not more than 3 years, and a special assessment of $100. With respect to certain offenses, the Court shall order the defendant to make restitution to any victim of the offenses, and with respect to other offenses, the Court may order the defendant to make restitution to any victim of the offenses, or to the community, as set forth below.

3.    Elements of the Offenses

The defendant acknowledges understanding the nature and elements of the offenses with which defendant has been charged and to which defendant is pleading guilty.

The elements of Count One are:

First:    two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit health care fraud, as charged in the Information; and

Second:    the defendant knew the unlawful purpose of the plan and willfully joined in it.

Defendant's Initials _____        2

The elements of Count Two are:

First:  the defendant made and subscribed a return, statement, or other document which was false as to a material matter;

Second:  the return, statement, or other document contained a written declaration that it was made under the penalties of perjury;

Third:  the defendant did not believe the return, statement, or other document to be true and correct as to every material matter; and

Fourth:  the defendant acted willfully.

4.  Indictment Waiver

Defendant will waive the right to be charged by way of indictment before a federal grand jury.

5.  No Further Charges

If the Court accepts this plea agreement, the United States Attorney's Office for the Middle District of Florida agrees not to charge defendant with committing any other federal criminal offenses known to the United States Attorney's Office at the time of the execution of this agreement, related to the conduct giving rise to this plea agreement.

6.  Restitution

Pursuant to 18 U.S.C. § 3663A(a)–(c), defendant agrees to make full restitution to the Medicare Program, the Civilian Health and Medical Program of

Defendant's Initials ⟨W⟩                    3

the Department of Veterans Affairs ("CHAMPVA"), and any other victims as determined by the Court related to the allegations in Count One.

In addition, pursuant to 18 U.S.C. § 3663(a)(3), the defendant also voluntarily agrees to pay all taxes, interest, and penalties found to be lawfully owed and due to the Internal Revenue Service for the year 2017 related to the allegations in Count Two and as further detailed in the Factual Basis of this Plea Agreement, and to cooperate with and provide to the Internal Revenue Service any documentation necessary for a correct computation of all taxes due and owing for that year, and further agrees that the Court may make this term a condition of any sentence of probation or supervised release.

7.   Guidelines Sentence

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States will recommend to the Court that the defendant be sentenced within the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines, as adjusted by any departure the United States has agreed to recommend in this plea agreement. The parties understand that such a recommendation is not binding on the Court and that, if it is not accepted by this Court, neither the United States nor the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

Defendant's Initials _____                    4

8. Low End

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a sentence at the low end of the applicable guideline range, as calculated by the Court. The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

9. Acceptance of Responsibility—Three Levels

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG §3E1.1(a). The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with the provisions of USSG §3E1.1(b) and all terms of this Plea Agreement, including but not limited to, the timely submission of the financial

Defendant's Initials _____      5

affidavit referenced in Paragraph B.5., the United States agrees to file a motion pursuant to USSG §3E1.1(b) for a downward adjustment of one additional level. The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

    10.    Cooperation—Substantial Assistance to be Considered

        Defendant agrees to cooperate fully with the United States in the investigation and prosecution of other persons, and to testify, subject to a prosecution for perjury or making a false statement, fully and truthfully before any federal court proceeding or federal grand jury in connection with the charges in this case and other matters, such cooperation to further include a full and complete disclosure of all relevant information, including production of any and all books, papers, documents, and other objects in defendant's possession or control, and to be reasonably available for interviews which the United States may require. If the cooperation is completed prior to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion at the time of sentencing

Defendant's Initials            6

recommending (1) a downward departure from the applicable guideline range pursuant to USSG §5K1.1, or (2) the imposition of a sentence below a statutory minimum, if any, pursuant to 18 U.S.C. § 3553(e), or (3) both. If the cooperation is completed subsequent to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion for a reduction of sentence within one year of the imposition of sentence pursuant to Fed. R. Crim. P. 35(b). In any case, the defendant understands that the determination as to whether "substantial assistance" has been provided or what type of motion related thereto will be filed, if any, rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

11.    Use of Information—Section 1B1.8

Pursuant to USSG §1B1.8(a), the United States agrees that no self-incriminating information which the defendant may provide during the course of defendant's cooperation and pursuant to this agreement shall be used in determining the applicable sentencing guideline range, subject to the restrictions and limitations set forth in USSG §1B1.8(b).

Defendant's Initials _____     7

12.    Forfeiture of Assets

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 982(a)(7), whether in the possession or control of the United States, the defendant, or defendant's nominees. The assets to be forfeited are the following assets which constitute proceeds traceable to the commission of the offense charged in Count One:

1)    Approximately $852,607.49 seized from JPMorgan Chase Bank account number 227791859, in the name of American Bracing Solutions, Inc.;

2)    Approximately $850,080.62 seized from JPMorgan Chase Bank account number 227185912, in the name of Back Braces Plus, Inc.;

3)    Approximately $508,806.42 seized from JPMorgan Chase Bank account number 228352131, in the name of Caring for Your Pain Bracing, Inc.;

4)    Approximately $147,265.81 seized from JPMorgan Chase Bank account number 232637006, in the name of Ace Medical Supply, Inc.;

5)    Approximately $939,125.08 seized from JPMorgan Chase Bank account number 233569596, in the name of First Stop Medical Supply, Inc.;

6)    Approximately $28,523.93 seized from JPMorgan Chase Bank account number 265680337, in the name of Helpful Home Medical Supply, Inc.;

7)    Approximately $2,335.96 seized from JPMorgan Chase Bank account number 329877200, in the name of Olive Medical Solutions, Inc.;

Defendant's Initials ⟨W⟩                    8

8)   Approximately $279.85 seized from JPMorgan Chase Bank account number 356253333, in the name of Sunray Medical Supply, Inc.;

9)   Approximately $1,226.08 seized from JPMorgan Chase Bank account number 356259959, in the name of Lorraine Health, Inc.;

10)  Approximately $2,539.80 seized from JPMorgan Chase Bank account number 356266012, in the name of Amber Health, Inc.;

11)  Approximately $4,359.11 seized from JPMorgan Chase Bank account number 356583531, in the name of Opal Fox, Inc.;

12)  Approximately $487,409.64 seized from JPMorgan Chase Bank account number 267115919, in the name of Wellness Medical Solutions, Inc.;

13)  Approximately $123,317.80 seized from JPMorgan Chase Bank account number 276100275, in the name of Self-Care Bracing;

14)  Approximately $201,594.23 seized from JPMorgan Chase Bank account number 950625660, in the name of West Bay Medical Supply;

15)  Approximately $1,491,690.90 seized from JPMorgan Chase Bank account number 252611873, in the name of CP Bracing Supply, Inc.;

16)  Approximately $1,479,683.98 seized from JPMorgan Chase Bank account number 935260518, in the name of LJH Medical Solutions;

17)  Approximately $921,808.72 seized from JPMorgan Chase Bank account number 935025291, in the name of Jackson Medical Supply, Inc.;

18)  Approximately $111,491.66 seized from JPMorgan Chase Bank account number 939989922, in the name of Sunshine Bracing Solutions;

Defendant's Initials _____

9

19) Approximately $154,099.98 seized from JPMorgan Chase Bank account number 258215737, in the name of Active Assist DME;

20) Approximately $366,435.57 seized from Wells Fargo Bank account number 5790936768, in the name of Regency, Inc.;

21) Approximately $2,214,460.72 seized from BB&T Bank account number 243573432 Kelly Wolfe;

22) Approximately $78,931.72 seized from JPMorgan Chase Bank account number 279301987, in the name of Paradise Medical Solutions, Inc.;

23) Approximately $137.37 seized from JPMorgan Chase Bank account number 356250065, in the name of Crystal Medical Solutions;

24) Approximately $1,500.00 seized from JPMorgan Chase Bank account number 301597503, in the name of Clearwater Medical Supply, Inc.;

25) Approximately $53.10 seized from JPMorgan Chase Bank account number 298336113, in the name of Franz Medical;

26) Approximately $869,859.98 seized from Wells Fargo Bank account number 2813610439, in the name of Absolute Comfort Medical;

27) Approximately $1,025,453.76 seized from JPMorgan Chase Bank account number 288108076, in the name of Advanced Medical Supply, LLC.;

28) Approximately $120.98 seized from JPMorgan Chase Bank account number 357301230, in the name of American Medical Solution;

29) Approximately $1,041,600.35 seized from JPMorgan Chase Bank account number 285851157, in the name of Belle Oak Bracing;

Defendant's Initials _____

30)   Approximately $269,793.79 seized from JPMorgan Bank account number 229897209, in the name of Bracing Partners, Inc.;

31)   Approximately $485.57 seized from Rensant Bank account number 8019575251, in the name of Cherry Medical Supply, Inc.;

32)   Approximately $108,342.34 seized from Bank of America account number 229057958245, in the name of Cordial Medical Supply, Inc.;

33)   Approximately $890,887.23 seized from JPMorgan Chase Bank account number 228526270, in the name of Discovery Medical Supply;

34)   Approximately $25,101.25 seized from Renasant Bank account number 8018969558, in the name of Helpful Home Medical Supply, Inc.;

35)   Approximately $160,531.10 seized from Bank of America account number 898095299517, in the name of Indian Shores Bracing, Inc.;

36)   Approximately $268,338.02 seized from JPMorgan Chase Bank account number 935179502, in the name of Lucky Medical Supply, Inc.;

37)   Approximately $828,765.87 seized from JPMorgan Chase Bank account number 285871825, in the name of Mainlands Medical;

38)   Approximately $193,689.62 seized from JPMorgan Chase Bank account number 285825797, in the name of MKS Medical Supply Inc.;

39)   Approximately $845,429.97 seized from Renasant Bank account number 8012641321, in the name of Paradise Medical Solutions, Inc.;

40)   Approximately $248,659.04 securing Renasant Bank Official Check number 10620830;

41)   Approximately $9.13 seized from JPMorgan Chase Bank account number 357513891, in the name of River Ramp, Inc.;

Defendant's Initials             11

42)    Approximately $799,226.38 seized from JP Morgan
       Chase bank account 357297669, in the name of SST
       Medical Solutions Inc.;

43)    Approximately $31,063.54 seized from Bank of
       America account number 325110205140, in the name
       of Star Medical Supply, Inc.;

44)    Approximately $26.68 seized from JPMorgan Chase
       Bank account number 356578556, in the name of Tiger
       Medical, Inc.;

45)    Approximately $1,975.17 seized from JPMorgan Chase
       Bank account number 462971560, in the name of Titan
       Medical Supply;

46)    Approximately $1,022,695.79 seized from Wells Fargo
       Bank account number 2617109521, in the name of Tree
       Top Medical Inc.;

47)    Approximately $156,924.44 seized from Bank of
       America account number 229057958232, in the name
       of Village Medical Supply, Inc.;

48)    Approximately $616,559.40 seized from Wells Fargo
       Bank account number 5130704850, in the name of
       Westside Medical Bracing, Inc.;

49)    $100,000 of the proceeds from the sale of the real
       property located at 454 20th Avenue, Indian Rocks
       Beach, Florida;

50)    Approximately $1,520,988.47 held by CMS for
       fraudulent claims submitted by Absolute Comfort
       Medical;

51)    Approximately $263,385.32 held by CMS for
       fraudulent claims submitted by Ace Medical Supply;

52)    Approximately $118,354.58 held by CMS for
       fraudulent claims submitted by Active Assist DME,
       Inc.;

53)    Approximately $774,710.47 held by CMS for
       fraudulent claims submitted by Advanced Medical
       Supply, LLC;

Defendant's Initials             12

54) Approximately $700,536.69 held by CMS for fraudulent claims submitted by American Bracing Solutions;

55) Approximately $708,646.17 held by CMS for fraudulent claims submitted by Back Braces Plus;

56) Approximately $1,146,963.12 held by CMS for fraudulent claims submitted by Belle Oak Bracing;

57) Approximately $821,141.50 held by CMS for fraudulent claims submitted by Bracing Partners;

58) Approximately $960,086.19 held by CMS for fraudulent claims submitted by Campbell Medical Supply, Inc.;

59) Approximately $1,315,051.02 held by CMS for fraudulent claims submitted by Caring For Your Pain Bracing;

60) Approximately $280,145.79 held by CMS for fraudulent claims submitted by Cherry Medical Supply, Inc.;

61) Approximately $360,610.28 held by CMS for fraudulent claims submitted by Clearwater Medical Supply;

62) Approximately $274,699.99 held by CMS for fraudulent claims submitted by Cordial Medical Supply;

63) Approximately $2,133,783.45 held by CMS for fraudulent claims submitted by CP Bracing Supply;

64) Approximately $374,953.40 held by CMS for fraudulent claims submitted by Decision One Health;

65) Approximately $656,349.45 held by CMS for fraudulent claims submitted by Discovery Medical Supply, Inc.;

66) Approximately $2,347,500.66 held by CMS for fraudulent claims submitted by First Stop Medical Supply;

67) Approximately $457,305.94 held by CMS for fraudulent claims submitted by Franz Medical;

68) Approximately $13,270.15 held by CMS for fraudulent claims submitted by Graceful Medical Supply;

Defendant's Initials _____   13

69) Approximately $27,768.60 held by CMS for fraudulent claims submitted by Healthsource DME, Inc.;

70) Approximately $282,100.72 held by CMS for fraudulent claims submitted by Helpful Home Medical Supply, Inc.;

71) Approximately $991,575.03 held by CMS for fraudulent claims submitted by Holiday Medical Solutions, Inc.;

72) Approximately $418,631.36 held by CMS for fraudulent claims submitted by Indian Shores Bracing;

73) Approximately $1,201,992.63 held by CMS for fraudulent claims submitted by Jackson Medical Supply, Inc.;

74) Approximately $93,640.86 held by CMS for fraudulent claims submitted by KS Medical Solutions, Inc.;

75) Approximately $381,634.21 held by CMS for fraudulent claims submitted by Landmark Medical LLC;

76) Approximately $980,391.08 held by CMS for fraudulent claims submitted by Layne Medical Supply;

77) Approximately $977,786.08 held by CMS for fraudulent claims submitted by Lucky Medical Supply;

78) Approximately $1,688,169.99 held by CMS for fraudulent claims submitted by Mainlands Medical;

79) Approximately $47,168.44 held by CMS for fraudulent claims submitted by Michelle Medical Solutions Inc.;

80) Approximately $20,524.80 held by CMS for fraudulent claims submitted by MKS Medical Supply;

81) Approximately $285,226.46 held by CMS for fraudulent claims submitted by Paradise Medical Solutions, Inc.;

82) Approximately $217,631.44 held by CMS for fraudulent claims submitted by Perfect Motion Medical;

83) Approximately $257,342.52 held by CMS for fraudulent claims submitted by Pinnacle DME;

84) Approximately $121,732.71 held by CMS for fraudulent claims submitted by Sandy Shores Medical;

Defendant's Initials _____                    14

85)   Approximately $452,638.56 held by CMS for fraudulent claims submitted by Self-Care Bracing, Inc.;

86)   Approximately $657,897.39 held by CMS for fraudulent claims submitted by Star Medical;

87)   Approximately $92,293.92 held by CMS for fraudulent claims submitted by Sunshine Bracing Solutions Inc.;

88)   Approximately $1,055,986.37 held by CMS for fraudulent claims submitted by Sunshine Medical Solutions, Inc.;

89)   Approximately $150,632.12 held by CMS for fraudulent claims submitted by Tiger Medical, Inc.;

90)   Approximately $666,490.58 held by CMS for fraudulent claims submitted by Tower Medical Supply, Inc.;

91)   Approximately $1,816,145.14 held by CMS for fraudulent claims submitted by Tree Top Medical, Inc.;

92)   Approximately $268,472.75 held by CMS for fraudulent claims submitted by Twilight Medical, Inc.;

93)   Approximately $558,476.38 held by CMS for fraudulent claims submitted by Village Medical Supply;

94)   Approximately $1,700,544.76 held by CMS for fraudulent claims submitted by Wellness Medical Solutions, Inc.;

95)   Approximately $73,041.92 held by CMS for fraudulent claims submitted by West Bay Medical Supply, Inc.; and

96)   Approximately $2,293,725.51 held by CMS for fraudulent claims submitted by Westside Medical Bracing.

Although the defendant only owned and/or controlled the assets numbered 7, 10, 11 20, 21, and 49 above, all of the listed assets constitute proceeds of the conspiracy to commit health care fraud offense charged in Count One. The parties recognize and agree that the defendant's acknowledgment in this provision concerning the remaining listed assets (1–19, 22–48, 50–96) should not be utilized in any

Defendant's Initials ⟨W⟩                    15

calculation of the defendant's relevant conduct under USSG § 1B1.3 (Relevant Conduct), and the United States agrees that it will not raise or support any argument to the contrary based upon the defendant's acknowledgment herein.

The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil, judicial or administrative forfeiture action. The defendant also agrees to waive all constitutional, statutory and procedural challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

The defendant admits and agrees that the conduct described in the Factual Basis below provides a sufficient factual and statutory basis for the forfeiture of the property sought by the government. Pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered. In the event the forfeiture is omitted from the judgment, the defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

The defendant agrees to take all steps necessary to identify and

Defendant's Initials _____                    16

locate all property subject to forfeiture and to transfer custody of such property to the United States before the defendant's sentencing (assuming defendant possesses or controls said property). To that end, the defendant agrees to be interviewed by the government, prior to and after sentencing, regarding such assets and their connection to criminal conduct. The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States. The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG § 1B1.8 will not protect from forfeiture assets disclosed by the defendant as part of the defendant's cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to the forfeitable assets before the defendant's sentencing. In addition to providing full and complete information about forfeitable assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

Defendant's Initials ____          17

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture. The defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive the defendant, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement. The forfeitability of any particular property pursuant to this agreement shall be determined as if the defendant had survived, and that determination shall be binding upon defendant's heirs, successors and assigns until the agreed forfeiture, including the forfeiture of any substitute assets, is final.

**B.    Standard Terms and Conditions**

    1.    Restitution, Special Assessment and Fine

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, <u>shall</u> order the defendant to make restitution to any victim of the offenses, pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offenses, pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement. The defendant further understands that compliance

Defendant's Initials _____          18

with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (28 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant=s restitution obligation is satisfied.

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013.

The defendant understands that this agreement imposes no limitation as to fine.

2.   Supervised Release

The defendant understands that the offenses to which the defendant is pleading provide for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

3.   Immigration Consequences of Pleading Guilty

The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

Defendant's Initials _____                    19

4.    Sentencing Information

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the counts to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

5.    Financial Disclosures

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition. The defendant promises that his financial statement and disclosures will be complete, accurate and truthful and will include all assets in which he has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, dependent, nominee or other third party. The defendant further agrees to execute any documents requested by the United States needed to obtain from any third

Defendant's Initials _____                    20

parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this Plea Agreement, consents to the release of the defendant's tax returns for the previous five years. The defendant similarly agrees and authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court. The defendant expressly authorizes the United States Attorney's Office to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

6.    Sentencing Recommendations

It is understood by the parties that the Court is neither a party to nor bound by this agreement. The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office. The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office. Defendant

Defendant's Initials _____                    21

further understands and acknowledges that any discussions between defendant or

defendant's attorney and the attorney or other agents for the government

regarding any recommendations by the government are not binding on the Court

and that, should any recommendations be rejected, defendant will not be

permitted to withdraw defendant's plea pursuant to this plea agreement. The

government expressly reserves the right to support and defend any decision that

the Court may make with regard to the defendant's sentence, whether or not such

decision is consistent with the government's recommendations contained herein.

7.   <u>Defendant's Waiver of Right to Appeal the Sentence</u>

The defendant agrees that this Court has jurisdiction and authority

to impose any sentence up to the statutory maximum and expressly waives the

right to appeal defendant's sentence on any ground, including the ground that the

Court erred in determining the applicable guidelines range pursuant to the United

States Sentencing Guidelines, except (a) the ground that the sentence exceeds the

defendant's applicable guidelines range <u>as determined by the Court</u> pursuant to

the United States Sentencing Guidelines; (b) the ground that the sentence exceeds

the statutory maximum penalty; or (c) the ground that the sentence violates the

Eighth Amendment to the Constitution; provided, however, that if the

government exercises its right to appeal the sentence imposed, as authorized by

Defendant's Initials ⟨W⟩          22

18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

8.    Middle District of Florida Agreement

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and cannot bind other federal, state, or local prosecuting authorities, although this office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

9.    Filing of Agreement

This agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

10.    Voluntariness

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is

Defendant's Initials _____                      23

pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any). The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial. The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement. The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

Defendant's Initials _____                    24

11.    Factual Basis

Defendant is pleading guilty because defendant is in fact guilty. The defendant certifies that defendant does hereby admit that the facts set forth below are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

### FACTS

Beginning in or around October 2017, and continuing through in or around April 2019, in the Middle District of Florida, and elsewhere, the defendant, KELLY WOLFE knowingly and willfully conspired and agreed with others to defraud federal health care benefit programs, including Medicare and CHAMPVA, and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by a health care benefit program, in connection with the delivery of and payment for health care benefit services. Additionally, WOLFE, under penalty of perjury, willfully made and subscribed a tax return—specifically, a U.S. Individual Income Tax Return, Form 1040—that was materially false, as she then and there knew, as the Form 1040 materially underreported WOLFE's taxable income and total tax owing for the tax year 2017.

Defendant's Initials _WW_          25

*The Medicare Program*

The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

Medicare covered different types of benefits, which were separated into different program "parts." Medicare "Part B" covered outpatient care and supplies. Supplies included, among other items, "durable medical equipment" ("DME"), which included, pertinently, braces (*e.g.*, knee braces, back braces, shoulder braces, wrist braces, and other "off-the-shelf" braces). Medicare Part B covered the aforementioned items and services when they were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

Physicians, clinics, and other health care providers, including DME suppliers (collectively, "providers") that provided supplies to beneficiaries were able to apply for and to obtain unique identification numbers allowing them to bill Medicare. Such unique identification numbers included, pertinently, (i)

Defendant's Initials ⎵⎵⎵

26

Medicare "provider numbers," and (iii) "Provider Transaction Access Numbers" ("PTANs"). Providers that received Medicare provider numbers and/or PTANs could file claims with Medicare to obtain reimbursement for medically necessary services or supplies provided to beneficiaries. To receive Medicare reimbursement, providers needed to have, among other things, applied to the Medicare Administrative Contractor ("MAC") and executed written provider agreements and related documentation.

Under Medicare Part B, claims for DME supplies were adjudicated and processed through MACs, which were statutory agents of CMS. The MACs processed claims based on their assigned geographical area or "jurisdiction." For DME supplies, Medicare Part B claims were processed by the MACs known as CGS Administrators, LLC ("CGS") and Noridian Healthcare Solutions ("Noridian"). Together, CGS and Noridian are referred to as the "DME MACs."

*DME Claims under Medicare Part B*

DME, as previously noted, included, pertinently, knee braces, back braces, shoulder braces, wrist braces, and other "off-the-shelf" braces. Under Medicare Part B, claims for DME supplies could be submitted for payment to the DME MACs through system known as an "Electronic Data Interchange" ("EDI"), which allowed DME suppliers to transmit claims to Medicare electronically. To enroll in electronic claims submissions, Medicare required that DME suppliers

Defendant's Initials _____   27

complete a Common Electronic Data Interchange ("CEDI") agreement with the DME MACs. The CEDI agreement required DME suppliers to agree to several terms and conditions, including, for example, that it would submit accurate, complete, and truthful claim. They also had to agree that, because claims were paid from federal funds, anyone who misrepresented or falsified any record or other information relating to any submitted claims could be subject to a fine and/or imprisonment under Federal law.

To submit DME claims to Medicare, the DME supplier needed to report: (a) the type of service provided using a "Healthcare Common Procedure Coding System" or "HCPCS" code; (b) the date of service or supply; (c) the referring physician's NPI; (d) the charge for such services; (e) patient's diagnosis; (f) the NPI and PTAN for the DME supplier seeking reimbursement; and (g) certification that the supplies were medically necessary. The DME supplier also need certain information on file, including: (a) written documentation of a verbal order or a preliminary written order from a treating physician; (b) a detailed written order from the treating physician; (c) information from the treating physician concerning the beneficiary's diagnosis; and (d) proof of delivery of the orthotic brace to the beneficiary.

*Reliance on Telemedicine*

Telemedicine was a means of connecting patients to providers via a telecommunication technology, such as video-conferencing. Telemedicine companies hired physicians and other providers to furnish telemedicine services to individuals. Telemedicine companies typically paid "treating providers" a fee to consult with patients. In order to generate revenue, telemedicine companies typically either billed the Medicare program or other health insurance program.

Medicare Part B covered expenses for specified telehealth services only if certain requirements were met. These requirements included: (a) that the beneficiary was typically located in a rural area; (b) that the services were delivered via an interactive audio- and video-telecommunications system; and (c) that the beneficiary was at a practitioner's office or a specified medical facility— not at home—during the telehealth service furnished by a remote practitioner.

*Overview regarding CHAMPVA*

CHAMPVA, which is a federal health benefit program, was a comprehensive health care program in which the VA shared the cost of covered health care services and supplies with eligible beneficiaries. In general, the CHAMPVA program covered most health care services and supplies that were medically necessary. CHAMPVA was always the secondary payer to Medicare and reimbursed beneficiaries for costs that Medicare did not cover. Health care

Defendant's Initials _____        29

claims must have first been sent to Medicare for processing; Medicare would then electronically forward claims to CHAMPVA. For Medicare supplemental plans, CHAMPVA processed the remaining portion of the claim after receiving Medicare's explanation of benefits.

*The Scheme*

KELLY WOLFE owned Regency, Inc. ("Regency"), a DME billing and consulting company in Largo, Florida, which is within the Middle District of Florida. WOLFE operated Regency with the help of S.P. and M.K. Together, these conspirators are collectively referred to as the "Regency Faction."

Regency's consulting services included the creation and sale of "turn-key" DME supply companies to clients in the Middle District of Florida, the Southern District of Florida, the Southern District of California, and elsewhere. As part of this service, Regency assisted clients with the accreditation and Medicare-enrollment process. Regency also assisted, including during the conspiracy, with billing matters. Based on this, WOLFE had awareness that Medicare paid bills based on a fee schedule rather than the amount billed.

During the DME scheme, however, the Regency Faction and their client-conspirators engaged in trickery and deception to establish numerous DME supply companies—or, rather, "DME fronts." Wolfe and others and Regency created the DME fronts for their clients in the Middle District of Florida, the

Southern District of Florida, the Southern District of California, and elsewhere to facilitate the conspirators' submission of illegal DME claims to Medicare, CHAMPVA, and other federal health benefit programs.

Regency's client-conspirators included Patsy Truglia, a convicted felon who acquired at least five DME fronts from WOLFE, namely, Indian Shores Bracing, Inc. ("Indian Shores Bracing"), Village Medical Supply, Inc. ("Village Medical"), Cordial Medical Supply, Inc. ("Cordial Medical"), Self-Care Bracing, Inc. ("Self-Care Bracing"), and Tiger Medical, Inc. ("Tiger Medical"). Collectively, these five entities are referred to herein as the "Truglia DME Fronts." Truglia also controlled and operated a telemarketing operation (*i.e.*, Global One/Med-Connect) targeting the Medicare-aged population. Truglia was a decision-maker for both lines of business; his day-to-day manager was conspirator Ruth Fernandez. Together, Truglia and Fernandez, and other conspirators associated with these businesses are referred to as the "Truglia Faction."

Through the telemarketing operation, the Truglia Faction conspirators created "brace orders" using purported "telemedicine." The brace orders were then signed by medical practitioners who were paid, either directly or indirectly, illegal bribes and kickbacks. Often, the Truglia Faction conspirators sold the signed brace orders—or, rather, the illegal DME claims—to third-parties for

submission to Medicare and other federal health benefit programs. WOLFE referred an owner of a DME front to the Truglia Faction for these illegal transactions.

The Truglia Faction conspirators also submitted thousands of illegal DME claims to Medicare and other federal health care programs using the Truglia DME Fronts, which they had acquired from Regency. The Truglia DME Fronts, as detailed next, were fraudulently established through deceit, craft, and trickery during the credentialing process that Medicare required for billing privileges.

Here, WOLFE and the Regency Faction conspirators tricked and deceived Medicare and its agents to establish the Truglia DME Fronts under the Truglia Faction's control. The Regency Faction conspirators, including WOLFE, recognized that having multiple DME fronts would allow the conspirators to spread numerous DME claims across multiple fronts so as to evade scrutiny. For example, the conspirators acknowledged this in an email dated on or about July 27, 2018, where conspirator Fernandez asked WOFLE: "When can we start submitting 400 braces of more?" WOLFE responded: "As far as the number of bracing[,] I think 250-300 is a comfortable number [per front]."

To trick Medicare and its inspectors and agents, the conspirators placed the DME Fronts into the name of a "straw" owner, here, C.T. (*i.e.*, conspirator Truglia's wife). All five DME Fronts were placed in the sole ownership of

Defendant's Initials [signature]                    32

Truglia's wife, C.T., including, importantly, on the CMS Forms-855S submitted to Medicare. These CMS Forms-855S, as WOLFE learned, were materially incomplete regarding the true control, ownership, and management of the Truglia DME fronts, which were owned and/or controlled by conspirator Truglia and managed by conspirator Fernandez. By comparison, C.T. had little to no involvement in the operation of the Truglia DME fronts. Conspirator Truglia, notably, had a felony conviction within ten years of the Truglia DME Fronts' creation—meaning it was a reportable adverse legal event that the conspirators concealed from Medicare on the false and fraudulent CMS Forms-855S. To establish the DME Fronts, WOLFE and Regency charged the Truglia Faction conspirators approximately $60,000 for "consulting," or, alternatively, a "stock purchase" transaction.

WOLFE and the Regency Faction conspirators also employed other tricks and devices to dupe Medicare into approving DME billing privileges, including for the Truglia Faction's DME Fronts. For example, the Regency Faction created a drop-shipping company called "Magic Medical." During the conspiracy, they used the entity to execute sham inventory contracts with DME fronts. Thereafter, the Magic Medical contracts—which were necessary for any DME storefront without its own inventory—were planted at DME fronts. The Regency Faction conspirators also planted fake patient files for bogus DME sales at the stores.

Defendant's Initials _____        33

Law-enforcement officers located sham "Magic Medical" contracts and fake patient files at numerous DME fronts, including Cordial Medical, which was a Truglia DME Front that Truglia, in whole or in part, owned, controlled, held financial interests in, and/or managed.

Finally, as part of its billing service, the Regency Faction conspirators executed the submission of thousands of illegal DME claims to Medicare for the Truglia Faction conspirators. Regency was, in turn, paid approximately 5% of all paid claims.

Between in or about July 2018 through April 2019, the Truglia DME Fronts, which the Regency Faction had established, submitted $25 million in illegal DME claims to Medicare and CHAMPVA, resulting in at least approximately $10 million in payments.

### WOLFE's Materially False Tax Return

In addition to the above, for tax year 2017, WOLFE, under penalty of perjury, willfully made and subscribed a materially false tax return, *i.e.*, the U.S. Individual Income Tax Return, Form 1040 (the "Form 1040"). On or about March 16, 2018, WOLFE signed the Form 1040 under penalty of perjury, knowing, then and there, that it was materially false. Specifically, on the Form 1040 filed with the Internal Revenue Service ("IRS"), WOLFE underreported her taxable income and total tax owing on, respectively, lines 43 and 63. On line 43

Defendant's Initials _____    34

of the Form 1040, WOLFE falsely claimed to have had taxable income in the amount of $528,627, when in truth and in fact, she had taxable income in the amount of at least approximately $646,221. Concomitantly, WOLFE reported, on line 63 of the Form 1040, a total tax of $165,155, when, based on her true income, she owed the IRS at least approximately $213,119 in taxes. WOLFE willfully concealed the additional income of approximately $117,594 from the IRS by falsely classifying this amount as "business expenditures" for Regency. WOLFE's concealment was also reflected on Regency's Form 1120S (*i.e.*, the U.S. Income Tax Return for an S Corporation) for tax year 2017, which WOLFE also signed and filed as Regency's Officer and President. For tax year 2017, WOLFE paid for numerous personal items and services (*e.g.*, vacations, manicures) using Regency's funds. Then, rather than properly report these purchases as "owner's distributions," WOLFE falsely classified the personal spending as purported business expenditures (*i.e.*, "amexmarketing" and/or "marketing"), which WOLFE knew was false. As a result of her false classifications, WOLFE failed to pay at least $47,964 in taxes due and owing to the IRS.

12.   Entire Agreement

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and

no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

Defendant's Initials _____

13.   Certification

The defendant and defendant's counsel certify that this plea

agreement has been read in its entirety by (or has been read to) the defendant and

that defendant fully understands its terms.

DATED this __18th__ day of December 2020.

MARIA CHAPA LOPEZ
United States Attorney


Kelly Wolfe
Defendant

Kristen A. Fiore
Assistant United States Attorney


Ed Suarez, Esq.
Attorney for Defendant

1-5-21

Jay G. Trezevant
Assistant United States Attorney
Chief, Economic Crimes Section

37